IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2018

**IN RE MCKENZIE O., ET AL.**

**Appeal from the Juvenile Court for Sullivan County
No. 16-JV-41322      Mark Toohey, Judge**

_____

**No. E2017-00956-COA-R3-PT**

_____

Mother appeals the trial court's decision to terminate her parental rights to two children on the grounds of (1) substantial noncompliance with the requirements of the permanency plan and (2) persistence of conditions. She further challenges the trial court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the children. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, J., joined, and J. STEVEN STAFFORD, P.J., W.S., filed a separate dissenting opinion.

Kenneth E. Hill, Kingsport, Tennessee, for the appellant, Krystal J. S.

Herbert H. Slatery, III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Claire A. Addlestone, Kingsport, Tennessee, Guardian Ad Litem.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Krystal S. ("Mother") is the biological mother of McKenzie O., born in January 2005, and Jeremiah S., born in July 2007.[1] Beginning in 2005, the Department of Children's Services ("DCS" or "the Department") became involved with the family on at least eighteen occasions. The investigations usually involved allegations of drug use or a lack of supervision. In October 2012, DCS received a referral alleging that Mother failed

---

[1] The trial court terminated the parental rights of the children's fathers; they are not parties to this appeal.

to provide adequate supervision and the children were nutritionally neglected and exposed to drugs. According to the allegations, Mother acted "crazy" because she used bath salts daily. Furthermore, she drove a car with only two seats. As a result, she made two of her children ride in the trunk of the car when transporting all of them.[2] The Department made several attempts to investigate the allegations, but Mother refused to cooperate or even allow DCS into her home. Ultimately, DCS was forced to obtain a court order authorizing the assistance of law enforcement to gain entry to Mother's home so DCS could complete its investigation.

On March 15, 2013, DCS received a referral alleging that the children had been left at school. The children's school had dismissed students early that day, and Mother failed to arrive to pick them up at the earlier time or make alternate arrangements. The school officials attempted to contact Mother by telephone but were unsuccessful. When Mother finally arrived, she appeared intoxicated and refused to submit to a drug screen despite a court order for her to comply. The Department transported the children to the DCS office to wait for Mother, but she never arrived. One week later, on March 22, 2013, DCS filed a petition alleging that the children were dependent and neglected due to exposure to drugs, lack of supervision, and nutritional neglect. The trial court issued an ex parte protective custody order that same day, finding probable cause to believe that the children were dependent and neglected for the reasons stated in DCS's petition, and placed them in the temporary custody of Donitta B. and Johnny B., their aunt and uncle. Following a preliminary hearing on DCS's petition, the trial court entered an order on June 25, 2013, adjudicating the children dependent and neglected and ordering that the children remain in the temporary custody of Mr. and Mrs. B.

On March 21, 2014, one year after the children were placed in the temporary custody of Mr. and Mrs. B., DCS received a referral alleging that the children were abandoned. Mrs. B. reported to DCS that she and her husband were under the impression that the children would be in their custody temporarily while Mother worked with DCS to regain custody; however, Mother did not work with DCS and had no contact with the children for more than a year. Moreover, according to Mrs. B., she could "no longer financially afford to care for the children" and addressing the children's behavioral issues "was taking away from her own children." She requested that DCS immediately remove the children from her home. Shortly after removing the children from Mr. and Mrs. B.'s custody, the Department created a permanency plan for the children, and the trial court ratified it. (We will discuss the requirements of the permanency plan in another section of this opinion.). On March 25, 2014, DCS filed a petition alleging the children were dependent and neglected due to abandonment. The juvenile court heard the petition on May 16, 2014, and entered an order on July 23, 2014, adjudicating the children dependent and neglected and placing them in DCS custody. The court noted that Mother failed to appear at the hearing despite having notice and appearing at the previous hearing.

---

[2] Mother has three children. Her oldest child is not a subject of this appeal.

DCS filed a petition to terminate Mother's parental rights on November 25, 2015, alleging two grounds for termination: substantial noncompliance with the permanency plan and persistence of conditions. On May 1, 2017, the trial court held a hearing on the termination petition; Mother again failed to appear. Appointed counsel for Mother made an oral motion to withdraw due to a lack of communication with Mother. Specifically, counsel stated that, three weeks prior to trial, Mother cancelled a scheduled meeting with him. He attempted to reschedule the appointment to properly answer the allegations in the termination petition but was unable to do so because Mother informed him that "she was in the Carolinas." The trial court granted the motion to withdraw,[3] and the trial proceeded with DCS calling only one witness, the DCS case manager, Travis Sherfey. Mr. Sherfey generally testified about the requirements of the permanency plans and Mother's failure to comply with those requirements.[4] He further testified that there were still concerns that Mother continued to abuse drugs and alcohol and that her lack of engagement with DCS demonstrated that she had "little or no interest in the welfare of [her] children." Finally, DCS offered into evidence the background paperwork it prepared throughout the case, including the following: birth certificates of the children, previous investigations conducted by Child Protective Services, the June 25, 2013 and the July 23, 2014 dependency and neglect orders, permanency plans, quarterly reports, records from foster care review boards, assessments, records from child and family team meetings, and information regarding child support.

After the hearing, the trial court issued an order finding there was clear and convincing evidence to terminate Mother's parental rights on the grounds of substantial noncompliance with the permanency plan and persistence of conditions. The court then concluded that it was in the best interest of the children for Mother's rights to be terminated.[5] Mother timely appealed.

---

[3] In similar situations, this court has found that, "'[o]ne who is entitled to be represented by appointed counsel can waive that right. Failure to cooperate with appointed counsel can constitute a waiver of the right to appointed counsel.'" *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at *5 (Tenn. Ct. App. Dec. 29, 2010) (quoting *In re M.E.*, No. M2003-00859-COA-R3-PT, 2003 WL 1838179, at *12 (Tenn. Ct. App. Aug. 16, 2004)).

[4] Most of Mr. Sherfey's testimony was elicited in response to leading questions.

[5] The dissent maintains that the trial court failed to perform its duties as it regards making findings of fact and conclusions of law. The trial court stated the following in its oral ruling:

> I find that The Department has established by clear and convincing evidence that [Mother's] parental rights to these children should be forever terminated on the grounds of failure to substantially comply with the Parenting Plan and the existence of persistence of conditions which make it not in the children's best interests to, for her to remain their legal parent. I also find that The Department has proven by clear and convincing evidence that it's in the children's best interest that parental rights be terminated. . . . *The proof in this case has pretty much tracked the allegations and the Petition to Terminate Parental Rights with respect to [Mother]. You can go ahead and prepare an Order and*

We consolidate and restate the issues raised by Mother on appeal as follows: (1) whether the trial court erred in finding by clear and convincing evidence that grounds existed to terminate Mother's parental rights, and (2) whether the trial court erred in determining that termination of Mother's parental rights was in the best interest of the children.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute. The state may interfere with parental rights in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). The existence of any one of the statutory grounds will support a termination of parental rights. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because terminating a parent's fundamental parental rights has severe consequences, termination cases require a court to apply a higher standard of proof. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). Consequently, a court must determine by clear and convincing evidence both that grounds for termination exist and that termination is in the best interest of the child.

---

*adopt those allegations along with the additional Testimony that presented here today as findings of fact and draw an Order.*

This oral ruling contains the court's finding that DCS proved by clear and convincing evidence the grounds of substantial noncompliance and persistence of conditions. Moreover, this oral ruling shows that the court examined the termination petition and, after hearing the proof at trial, found the proof consistent with the allegations in the petition. DCS then drafted the final order containing specific findings of fact and conclusions of law. The written order does contain the allegations from DCS's petition regarding the grounds of substantial noncompliance and persistence of conditions. The findings are not identically numbered with the petition and the order mentions proof offered at trial. For instance, the order mentions the affidavit of reasonable efforts DCS entered into proof at trial. In our view, the record does not appear to cast doubt as to whether the trial court exercised its independent judgment. That is not to say what the trial judge did was ideal, but it was enough. *See Prewitt v. Brown*, 525 S.W.3d 616, 622 (Tenn. Ct. App. 2017) (concluding that "[t]he mere fact that the trial court also adopted, even verbatim, reasoning and grounds stated in Defendant's motion for summary judgment and in his proposed findings is of little consequence; it merely indicates that the trial court was persuaded by Defendant's argument and agreed that the material facts were undisputed.") *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *6 (Tenn. Ct. App. Apr. 20, 2016).

- 4 -

Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then determine whether the facts, as found by the trial court or as supported by a preponderance of the evidence, establish the existence of one or more grounds for termination by clear and convincing evidence. *In re M.J.B.*, 140 S.W.3d at 654.

ANALYSIS

I. Grounds for Termination

A. Substantial Noncompliance with the Permanency Plan

We first consider the trial court's termination of Mother's parental rights based on her substantial noncompliance with the permanency plan. Tennessee Code Annotated section 36-1-113(g)(2) allows a court to terminate parental rights where "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656. Conditions that make foster care placement necessary "may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The court must then determine whether the noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

In the case at hand, DCS developed an initial permanency plan on April 17, 2014. Mother signed both the permanency plan and the accompanying document detailing the criteria and procedures for termination of her parental rights. Listing a goal of "Return to Parent," the permanency plan required Mother to (1) take medication only as prescribed, (2) participate in a mental health assessment and follow all recommendations, (3) notify DCS of any narcotic prescriptions before filling them, (4) participate in a drug and

- 5 -

alcohol assessment and follow all recommendations, (5) complete a parenting assessment and follow all recommendations, (6) participate in random drug screens, (7) provide releases of information for all healthcare providers, (8) notify treating physicians of past or current drug addiction involving narcotic pain medication, (9) obtain and maintain a legal source of income and provide documentation to DCS, (10) obtain and maintain safe transportation, (11) obtain and maintain stable housing adequate for the children, and (12) participate in medical and educational meetings for the children. The Department revised the permanency plan on October 13, 2014, February 3, 2015, and April 10, 2015, adding the goal of "Adoption" but reiterating the requirements of the initial plan. The trial court ratified the initial permanency plan and each revision, finding the requirements to be reasonably related to remedying the conditions that necessitated foster care. Mother does not argue on appeal that the requirements of the permanency plans are not reasonably related to the conditions that required the children's removal.

Mother argues that DCS failed to prove this ground by clear and convincing evidence because she made partial progress towards the requirements of the permanency plan. Mother emphasizes that the primary reason for the children's removal was her substance abuse and that she made progress towards resolving this issue during the pendency of the case. We agree that Mother made partial progress towards a few of the permanency plan's requirements addressing the conditions that necessitated foster care, but we disagree that this establishes that DCS failed to prove substantial noncompliance. Regarding the permanency plan's requirements addressing environmental neglect, Mother completed a parenting assessment, which recommended that she attend parenting classes, individual therapy, and outpatient therapy; however, Mother completed none of these recommendations. With respect to the permanency plan's requirements addressing her substance abuse, Mother completed a mental health assessment and was diagnosed with mood disorder, opioid dependency, cannabis abuse, and dependence-induced anxiety disorder. She also completed an alcohol and drug assessment, which recommended that she complete motivational group and women's recovery outpatient programs. At the time DCS filed the petition to terminate Mother's parental rights, she had not completed the recommendations of the alcohol and drug assessment and had failed multiple drug screens.

To support her argument that she partially complied with the plan's requirements, Mother heavily relies upon the fact that she eventually completed a one-month inpatient drug treatment program. A thorough examination of the record shows, however, that Mother did not complete the drug treatment program until September 14, 2016, approximately ten months after DCS filed the termination petition. We have previously recognized that a parent's efforts to comply with a permanency plan after the filing of a petition to terminate can be "too little, too late." *In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003) (holding that, although the mother's condition improved upon taking medication for her mental health issues, her efforts came "too little, too late" because she refused to take the medication until two months before trial); *see also In re*

*Malaya B.*, No. E2015-01880-COA-R3-PT, 2016 WL 3083045, at *5 (Tenn. Ct. App. May 24, 2016) (holding that the mother's efforts to comply with the permanency plan were "too little, too late" because she only made efforts to address her mental health issues after the filing of the termination petition); *In re Emily N.I.*, No. E2011-01439-COA-R3-PT, 2012 WL 1940810, at *16 (Tenn. Ct. App. May 30, 2012) (holding that "the Parents' refusal to complete a number of the requirements until after the termination petition was filed . . . was simply '[t]oo little, too late . . . .'"). Moreover, following completion of the alcohol and drug treatment program, Mother failed to comply with DCS's efforts to monitor her sobriety by refusing requests that she submit to drug screens and a hair follicle test.

Mother also failed to comply with the permanency plan's requirements related to providing a stable living environment for the children. After the children entered DCS custody, Mother never provided proof to DCS that she obtained housing suitable for herself and the children.[6] Furthermore, Mother was unemployed at the time of trial. She, in fact, never provided DCS with any proof that she had obtained a legal source of income following the children's removal from her custody.[7] Mother also failed to provide proof that she had valid transportation, a driver's license, or a plan for alternative transportation, as required by the plan.

Although Mother complied with a few of the requirements of the permanency plan, we conclude that clear and convincing evidence supports the trial court's finding that she did not substantially comply with the requirements of the permanency plan.

## B. Persistence of Conditions

The juvenile court also relied on Tenn. Code Ann. § 36-1-113(g)(3) as a ground for terminating Mother's parental rights. This ground is often referred to as "persistence of conditions" and allows courts to terminate parental rights in situations where:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

---

[6] A thorough examination of the record shows that Mother once reported to DCS that she was living with her fiancé but she never provided proof that the home was suitable for herself and the children.

[7] In May 2016, she reported that she opened a tanning salon but claimed that she could not provide proof of income because she was not making any money.

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

As this court has previously stated, the purpose behind this ground is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *6 (Tenn. Ct. App. May 28, 2014) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)). It focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005). The court must determine "the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). To prove the existence of this ground, it is not necessary for DCS "to prove that a parent-child relationship cannot be salvaged" or "to show that a parent is 'currently harmful' to a child's safety or future emotional stability." *In re Jamazin H.M.*, 2014 WL 2442548, at *6 (quoting *In re K.A.H.*, 2000 WL 1006959, at *5). "A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care." *Id.* (citing *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)).

The children were removed from Mother's custody in March 2013 and adjudicated dependent and neglected in June 2013 and July 2014. The trial court's skeletal dependency and neglect orders do not specify the precise factual grounds for the children's removal. Based upon the April 17, 2013 interim order granting temporary custody to Mr. and Mrs. B., the reasons for removal were Mother's substance abuse, failure to supervise, and neglect of the children's nutritional needs. The Department filed its petition to terminate in November 2015. Thus, the children had by then been removed from Mother's custody for more than six months by a court order finding dependency, neglect, or abuse. *See In re Audrey S.*, 182 S.W.3d at 874 (stating that persistence of conditions ground applies "only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse").

Mother does not dispute that the children were removed for dependency and neglect or that they have been removed for more than six months. She argues that DCS

- 8 -

failed to present proof that she continued to use drugs at the time of trial. A thorough examination of the record shows that Mother failed multiple drug tests prior to completing the one-month inpatient drug treatment program. Following completion of the drug treatment program, Mother submitted a negative drug screen on November 23, 2016. Thereafter, she refused further requests by DCS that she submit to drug screens. The Department argues that Mother's failure to comply with the drug screens proves that she has failed to remedy her substance abuse issues. In *In re Jimmy B.*, E2015-02070-COA-R3-PT, 2016 WL 2859180 (Tenn. Ct. App. May 11, 2016), we held that DCS failed to meet its burden of proving persistence of conditions when it was unable to present evidence at trial that the father continued to use drugs at the time the petition was filed due to the father's failure to cooperate with DCS.[8] *In re Jimmy B.*, 2016 WL 2859180, at *7-8. The court noted:

> Father's failure to show up consistently for visits, drug screens, and court hearings or to communicate effectively with DCS workers made it difficult for DCS to obtain clear and convincing evidence that the conditions that led to Jimmy's removal still persist. However, that is the burden of proof that must be met by a party seeking to terminate parental rights . . . regardless of how difficult it may be in some circumstances.

*Id.* at *8 (footnote omitted). Thus, inferring that Mother still abuses drugs because she failed to comply with drug screens does not constitute clear and convincing evidence to support the persistence of conditions ground with regard to Mother's substance abuse.

The only additional evidence regarding continued substance abuse DCS presented was the equivocal testimony of Mr. Sherfey. When asked if it was "accurate to say that [Mother has] continued to use drugs and alcohol which would render [her] unable to provide proper care and safety for these children," Mr. Sherfey responded, "I think there are still concerns that there may be use, yes." We conclude, therefore, that the record in this case does not contain clear and convincing evidence that Mother's substance abuse problems persisted at the time of trial.

Despite our conclusion regarding the lack of proof as to Mother's drug abuse by the time of trial, we believe there is clear and convincing evidence that the other "conditions that led to the child[ren's] removal or other conditions that in all reasonable probability would cause the child[ren] to be subjected to further abuse or neglect and that, therefore, prevent the child[ren's] safe return to the care of the parent or parents or the guardian or guardians, still persist." Tenn. Code Ann. § 36-1-113(g)(3)(A). At the time

---

[8] The court in *In re Jimmy B.*, 2016 WL 2859180, at *7, refers to "the time termination proceedings were initiated." Courts generally consider whether these conditions persist at the time of trial, however. *See In re Lillian D.*, No. E2016-00111-COA-R3-PT, 2016 WL 4505691, at *12-13 (Tenn. Ct. App. Aug. 26, 2016); *In re M.B.R.*, No. E2015-01906-COA-R3-PT, 2016 WL 3568183, at *6 (Tenn. Ct. App. June 23, 2016).

the children were removed from Mother's custody, she lacked stable housing, employment, and transportation. The record contains evidence showing that, during the five years between the children's removal from Mother's custody and trial, she never provided DCS with any proof that she had a stable living situation suitable for herself and the children. Moreover, she never provided proof to DCS that she had obtained legal employment or that she had valid transportation or even a plan for transportation. Mr. Sherfey testified that, at the time of trial, Mother "still [did] not have housing" and was unemployed.

The trial court found that there was "little chance that those conditions will be remedied soon so that the children can be returned safely to the home" and that "continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable, and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(B), (C). The evidence does not preponderate against these findings. We conclude that clear and convincing evidence supports the trial court's termination of Mother's parental rights on the ground of persistence of conditions.

## II. Best Interest

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights is in the best interest of the children. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interest." *Id.* The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all of the statutory factors and all of the proof." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

In this case, the trial court found that the best interest factors weighed in favor of terminating Mother's parental rights. Mother argues that the trial court's best interest analysis was insufficient to terminate her parental rights, however, because the court did

not consider all of the best interest factors. Examination of the trial court's order terminating Mother's rights shows that the court made some findings of fact and conclusions of law supporting its determination that termination of Mother's rights would be in the best interest of the children. Although the trial court did not mention all nine of the best interest factors in its order, it did specifically state in its oral ruling that the proof presented at trial tracked the allegations in DCS's termination petition, which included assertions pertaining to factors one through seven and factor nine as alleged against Mother or the children's fathers. To the extent that factor eight was not expressly mentioned by either the court or the termination petition, DCS presented proof at trial regarding whether Mother's mental status prevented her from effectively providing safe and stable care for the children. We conclude that the trial court considered all of the statutory factors, and its order is sufficient to support its determination that termination of Mother's rights is in the best interest of the children. *See In re Addalyne S.*, No. M2017-00958-COA-R3-PT, 2018 WL 1976175, at *14 (Tenn. Ct. App. Apr. 26, 2018) (holding that trial court sufficiently considered all best interest factors because the court "specifically mention[ed] the existence of the nine factors when determining the best interest of the child").

The trial court found that Mother failed to make an adjustment of "conduct or circumstances that would make it safe for the children to go home" and, despite "reasonable efforts by the state to help," "lasting change does not appear possible." *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). The record contains an affidavit of reasonable efforts detailing DCS's efforts to assist Mother, such as referring and paying for an alcohol and drug assessment, drug tests, a mental health assessment, a parenting assessment, and therapeutic visitation for six months. The Department further assisted Mother by providing her with a list of community resources, and communicating with her and notifying her of staffing positions. Despite the availability of these services for more than four years by the time of trial, Mother failed to complete most of the permanency plan's requirements addressing the conditions that caused the children's removal. For instance, Mother failed multiple drug tests during the four years following the children's removal. She did complete a one-month inpatient drug treatment program in September 2016 and submitted a negative drug test two months after completing the program. However, she refused further requests by DCS that she submit to drug screens. Moreover, at trial, Mr. Sherfey testified that there were still concerns that Mother was abusing drugs. The stability and neglect issues also remained unresolved because Mother never provided proof to DCS that she obtained a legal source of income to financially support the children, remained unemployed and without housing at the time of the termination hearing, and failed to provide proof that she had valid transportation or a transportation plan.

In addition, Mother failed to maintain regular visitation with the children. *See* Tenn. Code Ann. § 36-1-113(i)(3). Although she engaged in some visitation, she allowed long periods of time to pass in which she failed to visit the children. While the children

- 12 -

were in the temporary custody of Mr. and Mrs. B., Mother failed to visit them for an entire year. The Department permitted Mother to visit the children on Mondays or Tuesdays after they entered DCS custody; however, according to Mr. Sherfey, she visited the children only sporadically. In November 2016, DCS agreed to move her visits to every other Thursday. Mother failed to attend more than half of her visits after November 2016. In fact, she failed to visit the children for approximately two months immediately before trial.

Mother also failed to establish a meaningful relationship with the children. *See* Tenn. Code Ann. § 36-1-113(i)(4). The parenting assessment performed on Mother reported that McKenzie requested that the visits with Mother stop "because it stressed her out so much" and stated a desire to be adopted.

The trial court found that "changing caregivers at this stage of [the children's] lives [would] have a detrimental effect on them." *See* Tenn. Code Ann. § 36-1-113(i)(5). The children have not been in Mother's custody for more than five years. Since entering DCS custody, the children have been placed with several foster families, but the quarterly progress reports completed by DCS show that the children are doing well in foster care. For instance, one foster mother reported that, when the children came to live with her, Jeremiah "could not read or write anything," but he could "now read and write at grade level" and was "doing much better in school." The quarterly progress reports indicate that both children have struggled at times with behavior problems. With the current foster parents, however, both children receive case management services and counseling to address these issues.

The record shows that Mother showed neglect toward the children by exposing them to "brutality, physical, sexual, emotional or psychological abuse." Tenn. Code Ann. § 36-1-113(i)(6). Prior to being removed from Mother's custody, McKenzie reported to DCS that she inadvertently walked in on Mother and one of Mother's past boyfriends having sexual intercourse, and they continued to do so after McKenzie entered the room. From that point on, Mother and the boyfriend would have sexual relations in front of McKenzie. McKenzie further reported that a male houseguest at Mother's home unzipped his pants and placed her hand on his genitals. When Mother learned of this incident, she told McKenzie "not to say anything because DCS would take her away from [Mother's] home."

Mother's physical environment is not healthy or safe for the children. *See* Tenn. Code Ann. § 36-1-113(i)(7). At the time of trial, Mother remained unemployed and without permanent housing. Moreover, although she did complete a parenting assessment, she failed to follow any of the assessment's recommendations despite knowing that the children were removed from her custody, in part, because she neglected their basic needs.

Mother's long history of substance abuse is bothersome in relation to her mental and emotional state. *See* Tenn. Code Ann. § 36-1-113(i)(8). Shortly after the children entered DCS custody, Mother completed a mental health assessment and was diagnosed with mood disorder, opioid dependency, cannabis abuse, and dependence-induced anxiety disorder. The record shows that Mother failed to participate in individual therapy, motivational group therapy, and women's recovery to address her substance abuse problem. Furthermore, she refused drug screens even after completing an inpatient drug treatment program.

Finally, the record contains evidence that Mother paid some child support after the children were removed from the home. *See* Tenn. Code Ann. § 36-1-113(i)(9). This is not enough, however, to counteract the other factors that dictate that it is in the children's best interest to terminate Mother's parental rights.

In light of the foregoing, we conclude that there is clear and convincing evidence to establish that termination of Mother's parental rights is in the best interest of the children.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Krystal J. S., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

- 14 -